[PUBLISH]

In the

# United States Court of Appeals

### For the Eleventh Circuit

_____

No. 23-11286

_____

KRISTIE WILLIAMS,

Plaintiff-Appellee,

*versus*

BOARD OF TRUSTEES OF THE UNIVERSITY OF ALABAMA, THE,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Alabama
D.C. Docket No. 2:22-cv-00758-MHH

_____

Before JORDAN, NEWSOM, and BRASHER, Circuit Judges.

NEWSOM, Circuit Judge:

This appeal concerns the Family and Medical Leave Act—and, as it turns out, Congress's constitutional authority "[t]o raise and support Armies" and "[t]o provide and maintain a Navy." U.S. Const. art. I, § 8, cls. 12–13. Kristie Williams accused her former employer, the University of Alabama at Birmingham, of violating her rights under the Act. Although (for reasons we'll explain) it's not entirely clear at this stage of the proceedings, Williams seems to have alleged that she was entitled to leave under one or more of three of the Act's provisions—what we'll call the "family-care," "active-duty," and "servicemember-family" leave provisions. *See* 29 U.S.C. § 2612(a)(1)(C), (a)(1)(E), (a)(3). The University contends that Williams's suit is barred by state sovereign immunity. Insofar as Williams seeks only family-care leave under § 2612(a)(1)(C), this is an easy case—the Supreme Court has squarely held that sovereign immunity doesn't foreclose such suits. But Williams might instead (or also) be claiming active-duty or servicemember-family leave under § 2612(a)(1)(E) or § 2612(a)(3), respectively. That possibility requires us to resolve a more difficult question—namely, whether Alabama, by virtue of having agreed to the Constitution's plan that the national defense is the province of the federal government, has waived its immunity to suits brought under the Act's active-duty and servicemember-family leave provisions.

We hold that Williams's suit is not barred, no matter how conceived. To the extent that Williams alleges that she was

entitled to leave under the Act's family-care provision, her suit may proceed because Congress has validly abrogated Alabama's sovereign immunity with respect to family-care claims. And to the extent that Williams alleges that she was entitled to leave under the Act's active-duty or servicemember-family leave provisions, her suit may proceed because Alabama waived its sovereign immunity when it joined the Union and thereby assented to the plan of the Constitutional Convention. We therefore affirm the district court's denial of the Board's motion to dismiss and remand for further proceedings consistent with this opinion.

## I

### A

Kristie Williams used to work for the University of Alabama at Birmingham.[1] Then, a family crisis upended her job. While serving in the Marine Corps in Hawaii, Williams's daughter was allegedly sexually assaulted by a superior officer. As soon as Williams heard about the incident, she requested leave from the University under the Family and Medical Leave Act of 1993, 29 U.S.C. §§ 2601–2654, so that she could fly to Hawaii to take care of her daughter.

We'll unpack the details in due course, but in (very) short, the University approved Williams's leave request. To seek leave

_____

[1] Williams's case reaches us on a facial challenge to the district court's subject matter jurisdiction. Accordingly, for purposes of this appeal, we assume that her complaint's allegations are true. *Lord Abbett Mun. Income Fund, Inc. v. Tyson*, 671 F.3d 1203, 1206 (11th Cir. 2012).

under the FMLA (as the Act is known), Williams filled out a standard University-provided document titled "Military Family Medical Leave of Absence Request Form." Within two weeks, the University granted Williams about a month of FMLA leave. Despite having received the University's blessing to take time off to support her daughter, Williams alleges that she continued to get work-related emails and requests that she help with office projects. Although Williams told her colleagues that she was on continuous FMLA leave and shouldn't be working, she received increasingly critical feedback from supervisors about her work performance.

Things didn't improve. Supervisors placed her on "development plans" and told her that she needed to join weekly video-conference calls to track her progress. Williams eventually returned to regular work, but the criticism of her performance continued. Before long, she sensed that a pink slip was inevitable and resigned.

**B**

The FMLA entitles "eligible employees" to take unpaid leave "for any of several reasons." *Nevada Dep't of Hum. Res. v. Hibbs*, 538 U.S. 721, 724 (2003). Three of those reasons are relevant here. First, an eligible employee may take 12 weeks of so-called "family-care" leave "[i]n order to care for the spouse, or a son, daughter, or parent, of the employee, if such spouse, son, daughter, or parent has a serious health condition." 29 U.S.C. § 2612(a)(1)(C).

23-11286               Opinion of the Court                    5

Second, an employee may take 12 weeks of "active-duty" leave[2] in the event of a "qualifying exigency . . . arising out of the fact that the spouse, or a son, daughter, or parent of the employee is on covered active duty (or has been notified of an impending call or order to covered active duty) in the Armed Forces." *Id.* § 2612(a)(1)(E).[3] Finally, an employee may take up to 26 weeks of "[s]ervicemember family" leave to "care for [a] servicemember" who is an immediate family member. *Id.* § 2612(a)(3).

Congress enacted these leave provisions at different times. Family-care leave has been part of the FMLA from the beginning. *See* Family and Medical Leave Act of 1993, Pub. L. No. 103-3, § 102(a)(1)(C), 107 Stat. 6, 9. But active-duty leave and servicemember-family leave are newer. In 2008, Congress amended the FMLA in the annual defense authorization bill. *See* National Defense Authorization Act for Fiscal Year 2008, Pub. L. No. 110-181, § 585(a)(2), 122 Stat. 3, 129 (2008). That amendment added both active-duty leave and servicemember-family leave to the category of things that trigger FMLA protection. *See id.*; 29 U.S.C. § 2612(a)(1)(E), (a)(3).

FMLA leave entitlements may be enforced through the Act's private right of action. If an employer "interfere[s] with, restrain[s],

---

[2] The district court called leave taken under 29 U.S.C. § 2612(a)(1)(E) "active-duty leave," and we follow suit.

[3] What counts as a "qualifying exigency" is determined by the Secretary of Labor. 29 U.S.C. § 2612(a)(1)(E); *see* 29 C.F.R. § 825.126(b) (listing qualifying exigencies).

or den[ies] the exercise of" an eligible employee's FMLA rights, 29 U.S.C. § 2615(a)(1), the employee may seek "damages or equitable relief" against her "employer (including a public agency) in any Federal or State court of competent jurisdiction," *id.* § 2617(a)(2); *see also Hibbs*, 538 U.S. at 724–25.

## C

After Williams left her job, she sued the University of Alabama at Birmingham's parent institution, the Board of Trustees of the University of Alabama. The complaint asserted that she was entitled to FMLA leave and that the Board failed to honor that entitlement. Williams raised two claims: that the Board interfered with her exercise of her FMLA rights and that it retaliated against her for using those rights.

Although it's not entirely clear, Williams's complaint *seemed* to allege that she was entitled, specifically, to what we've called active-duty leave. She alleged that the University "approved Williams for Military Qualifying Exigency Leave pursuant to the FMLA." Compl. ¶ 17. That language echoes 29 U.S.C. § 2612(a)(1)(E), which provides that an eligible employee is entitled to FMLA leave if she faces a "qualifying exigency" related to a relative's active-duty service in the military.

The Board moved to dismiss, arguing that, as an arm of the State of Alabama, it was shielded from suit by sovereign immunity. The Board acknowledged that Congress had validly abrogated state sovereign immunity for FMLA suits based on an entitlement to family-care leave under 29 U.S.C. § 2612(a)(1)(C). *See Hibbs*, 538

U.S. at 740.  But here, the Board insisted, Williams had invoked active-duty leave—not family-care leave.  And, the Board argued, Congress had *not* validly abrogated state sovereign immunity for FMLA claims arising out of the Act's active-duty leave provision.

In its motion to dismiss, though, the Board (perhaps unwittingly) introduced the possibility that Williams might actually have been claiming an entitlement to a second kind of leave: servicemember-family leave under 29 U.S.C. § 2612(a)(3).  The Board attached to its motion a copy of the University's leave-request form that (it said) Williams filled out when she sought FMLA leave.  On the form, Williams checked a box indicating that she was the "[p]arent of a covered service member with a serious injury or illness."  Next to the box, the form said that "[t]his leave includes a special entitlement of up to 26 weeks of leave in a rolling 12-month period."  But the special 26-week entitlement and the term "covered servicemember" mirrors § 2612(a)(3)'s servicemember-family leave provision.

The district court denied the Board's motion to dismiss. *Williams v. Bd. of Trs. of Univ. of Ala.*, No. 2:22-cv-00758, 2023 WL 2601935, at *4 (N.D. Ala. Mar. 22, 2023).  In so doing, the court introduced a *third* possibility: that Williams had actually sought family-care leave under § 2612(a)(1)(C). *Id.*  According to the district court, servicemember-family leave isn't a distinct category of FMLA leave at all; instead, it is "linked" to family-care leave. *Id.* at *3.  The district court reasoned as follows:  Ordinarily, family-care leave under § 2612(a)(1)(C) lasts just 12 weeks—but, the court said,

if a leave-seeker satisfies § 2612(a)(3)'s requirements for service-member-family leave, then her leave entitlement extends to 26 weeks. *See id*. Here, the court explained, Williams's "daughter's assault" might "qualif[y] as [a] 'serious injury or illness' to a 'covered servicemember'" within the meaning of § 2612(a)(3). *Id*. at *4. Therefore, when Williams completed a form that appeared to invoke servicemember-family leave, she was *really* just seeking family-care leave—with the caveat that if she satisfied the servicemember-family leave requirements, her leave could run longer than usual. *See id*. at *3–4. And, as the Board recognized, the Supreme Court held in *Hibbs* that Congress had abrogated state sovereign immunity for FMLA suits based on an entitlement to family-care leave. 538 U.S. at 740. Accordingly, the district court held, because Williams was really just seeking a variant of family-care leave, *Hibbs* covered her suit, Congress had abrogated the Board's sovereign immunity, and her case could proceed. *Williams*, 2023 WL 2601935, at *4.

This is the Board's interlocutory appeal from the district court's denial of its motion to dismiss.[4]

---

[4] Two procedural points. First, a note about our jurisdiction over this appeal: In the ordinary course, we may hear only appeals from final judgments. *CSX Transp., Inc. v. City of Garden City*, 235 F.3d 1325, 1327 (11th Cir. 2000). There is no final judgment here. But under the collateral order doctrine, we nonetheless have jurisdiction to review a district court's denial of a motion to dismiss on sovereign-immunity grounds. *Summit Med. Assocs., P.C. v. Pryor*, 180 F.3d 1326, 1334 (11th Cir. 1999). Second, the standard of review: We review de novo both issues pertaining to subject matter jurisdiction and a district

## II

At this stage of the proceedings, we are tasked with deciding only one question:  Does sovereign immunity bar Williams's suit? We will not consider whether, on the merits, Williams was entitled to FMLA leave.  Nor, although the parties bitterly contest it, need we even definitively decide, based on the limited record before us, what kind of leave—family-care, active-duty, or servicemember-family leave—Williams requested.  As it turns out, no matter how Williams's suit is conceived—no matter what kind of leave she sought—the Board lacks sovereign immunity.  Let us explain.

## A

As a general proposition, the states, as sovereigns, enjoy immunity from lawsuits brought against them without their consent. *See Kimel v. Fla. Bd. of Regents*, 528 U.S. 62, 72–73 (2000).  Although we often refer to the states' "Eleventh Amendment immunity," that Amendment actually uses very "narrow[]" language.  *Blatchford v. Native Vill. of Noatak & Circle Vill.*, 501 U.S. 775, 779 (1991); *see* U.S. Const. amend. XI (referring, *e.g.*, to suits "commenced or prosecuted against one of the United States *by Citizens of another State*" (emphasis added)).  Nonetheless, since the Supreme Court's momentous decision in *Hans v. Louisiana*, 134 U.S. 1 (1890), courts "have understood the Eleventh Amendment to stand not so much for what it says, but for the presupposition of our constitutional

---

court's denial of a motion to dismiss on sovereign immunity grounds.  *Id*. at 1333–34.

structure which it confirms: that the States entered the federal system with their sovereignty intact" and "that the judicial authority in Article III is limited by this sovereignty." *Blatchford*, 501 U.S. at 779.

This so-called Eleventh Amendment immunity extends both to "the State itself" and to "arm[s] of the State." *Manders v. Lee*, 338 F.3d 1304, 1308 (11th Cir. 2003) (en banc) (quotation marks omitted). Here, no one disputes that the defendant—the Board of Trustees of the University of Alabama—is an "arm" of the State of Alabama. *Cf. Bd. of Trs. of Univ. of Ala. v. Garrett*, 531 U.S. 356, 363–64 (2001) (applying Eleventh Amendment immunity to a suit against the Board). And the Board insists that it hasn't consented to be sued. So, if we take the general rule at face value, Williams's FMLA action doesn't stand a chance.

But as is so often the case with general rules, the devil's in the details. As relevant here, there are two exceptions (so to speak) to state sovereign immunity. First, Congress, acting pursuant to its Fourteenth Amendment enforcement powers, *see* U.S. Const. amend XIV, § 5, may "abrogate" states' immunity. A valid abrogation requires two preconditions: (1) Congress must satisfy a clear-statement rule by "unequivocally" expressing its intent to strip the states of their immunity, *see Garrett*, 531 U.S. at 363; and (2) Congress's use of its Fourteenth Amendment enforcement authority "must exhibit 'congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end,'"

*id.* at 365 (quoting *City of Boerne v. Flores*, 521 U.S. 507, 520 (1997)).[5] Determining whether Congress's purported abrogation in a particular statute satisfies this congruence-and-proportionality test often involves a deep dive into the measure's legislative history and underlying purposes. *See, e.g.*, *Hibbs*, 538 at 728–37; *City of Boerne*, 521 U.S. at 530–32.

Second, and separately, the states may consent to be sued. *See Sossamon v. Texas*, 563 U.S. 277, 284 (2011). Such consent can of course be manifested in the usual ways—say, through a contract or state statute waiving immunity. *See id.* ("A State . . . may choose to waive its immunity in federal court at its pleasure."); *Port Auth. Trans-Hudson Corp. v. Feeney*, 495 U.S. 299, 306–07 (1990) (discussing state statutes that manifested consent to suit). But there's another possibility. The Supreme Court has explained that a state may also be sued "if it has agreed to suit in the 'plan of the Convention,' which is shorthand for 'the structure of the original Constitution itself.'" *PennEast Pipeline Co., LLC v. New Jersey*, 594 U.S. 482, 500 (2021) (quoting *Alden v. Maine*, 527 U.S. 706, 728 (1999)). Under this "plan of the Convention" doctrine, there are "certain waivers of sovereign immunity to which all States implicitly consented at the founding." *Id.* When a lawsuit slots into one of these "certain waivers," *id.*, "no congressional abrogation [is] needed" because

---

[5] Technically, the congruence-and-proportionality test applies only when Congress is exercising its "prophylactic" enforcement powers. *See United States v. Georgia*, 546 U.S. 151, 158 (2006); *Garrett*, 531 U.S. at 365. Congress is free to "create[e] private remedies against the States for *actual* violations" of the Fourteenth Amendment. *Georgia*, 546 U.S. at 158.

there's nothing to abrogate—"the States ha[ve] already 'agreed in the plan of the Convention not to assert any sovereign immunity defense,'" *Allen v. Cooper*, 589 U.S. 248, 258–59 (2020) (quoting *Cent. Va. Cmty. Coll. v. Katz*, 546 U.S. 356, 377 (2006)).

**B**

To the extent that Williams relies on an alleged entitlement to family-care leave under § 2612(a)(1)(C), the Board is subject to suit because Congress has validly abrogated the states' sovereign immunity.

In *Hibbs*, the Supreme Court held that an eligible employee could sue her state employer "in the event of the State's failure to comply with the family-care provision of the [FMLA]." 538 U.S. at 725. With respect to family-care leave, the Court concluded, Congress had both clearly expressed its intent to abrogate state sovereign immunity and exercised its Fourteenth Amendment enforcement powers in a way that was "congruent and proportional to the targeted violation." *Id.* at 726, 737 (citation and quotation marks omitted). So, inasmuch as Williams relies on an alleged entitlement to family-care leave, sovereign immunity doesn't bar her suit. That much is clear.

On appeal, Williams seeks to extend *Hibbs* by embracing the district court's conclusion that § 2612(a)(3) servicemember-family leave effectively *is* § 2612(a)(1)(C) family-care leave. Echoing the district court, Williams contends that the former is really just a particular subspecies of the latter. And accordingly, the argument

goes, *Hibbs*'s sovereign immunity holding covers a suit challenging a denial of a request for servicemember-family leave.

We're dubious. Post-*Hibbs* precedent makes clear that the Supreme Court's decision there goes only so far as to validate Fourteenth Amendment abrogation for family-care suits under § 2612(a)(1)(C). In *Coleman v. Court of Appeals of Maryland*, 566 U.S. 30 (2012), the Court considered a suit brought under the FMLA's "self-care" provision, which entitles an eligible employee to leave necessitated by "a serious health condition that makes [her] unable to perform the functions of [her] position." 29 U.S.C. § 2612(a)(1)(D). The Court held that, with respect to self-care suits, Congress had *not* satisfied the Fourteenth Amendment congruence-and-proportionality requirement and, accordingly, that the states remain immune to suit (absent their consent) for self-care-based FMLA lawsuits. *See Coleman*, 566 U.S. at 43–44. The divergent decisions in *Hibbs* and *Coleman* demonstrate that congruence and proportionality is not measured in gross but, rather, must be determined on a provision-by-provision basis. And even if servicemember-family leave is in some sense *connected to* family-care leave, it's not *the same as* family-care leave. As already explained, Congress enacted § 2612(a)(3) at a different time, and for different reasons. So, if servicemember-family-leave suits are to be justified on abrogation grounds, then § 2612(a)(3) must *itself* satisfy the congruence-and-proportionality test.

But we needn't decide today whether § 2612(a)(3) passes congruence-and-proportionality muster. As we explain in the next

section, active-duty and servicemember-family leave suits may proceed on an altogether different basis.

## C

To the extent that Williams relies on an alleged entitlement to either active-duty leave under § 2612(a)(1)(E) or servicemember-family leave under § 2612(a)(3), her suit may go forward—but for different reasons.  The Board is subject to suit pursuant to those provisions under the plan-of-the-Convention doctrine.

### 1

Over the years, the Supreme Court has recognized a handful of plan-of-the-Convention waivers.  According to the Court, the states have consented, for instance, to suits brought by the federal government, *United States v. Texas*, 143 U.S. 621, 646 (1892), suits brought by other states, *South Dakota v. North Carolina*, 192 U.S. 286, 318 (1904), suits brought in the context of bankruptcy proceedings, *Katz*, 546 U.S. at 379, and "condemnation suits by the Federal Government and its delegatees," *PennEast*, 594 U.S. at 508; *see id.* at 500 (summarizing plan-of-the-Convention waivers).

The most recent entry in the plan-of-the-Convention series is particularly relevant for present purposes.  In *Torres v. Texas Department of Public Safety*, 597 U.S. 580 (2022), the Supreme Court considered whether sovereign immunity barred a suit against Texas brought under USERRA, the Uniformed Services Employment and Reemployment Rights Act of 1994, 38 U.S.C. §§ 4301–4335.  The plaintiff there, a servicemember returning from Iraq and a former state employee, alleged that Texas had violated USERRA

by refusing to rehire him and to accommodate a service-related disability. *See Torres*, 597 U.S. at 585–86. Texas argued that sovereign immunity barred the suit, but the Supreme Court disagreed. It explained that plan-of-the-Convention waiver applies when "the federal power at issue is 'complete in itself, and the States consented to the exercise of that power—in its entirety—in the plan of the Convention.'" *Id.* at 589 (quoting *PennEast*, 594 U.S. at 508). Significantly for us, the Court held that Congress's "power to build and maintain the Armed Forces" satisfied that test. *Id.* at 590. For one thing, the Court explained, "the Constitution's text . . . strongly suggests a complete delegation of authority to the Federal Government to provide for the common defense." *Id.* For another, "the States, in coming together to form a Union, agreed to sacrifice their sovereign immunity for the good of the common defense." *Id.* at 599. Therefore, the Court held, the states waived their immunity with respect to suits implicating Congress's "power '[t]o raise and support Armies' and 'provide and maintain a Navy.'" *Id.* at 594 (alteration in original) (quoting U.S. Const. art. I, § 8, cls. 12–13). And because "Congress enacted USERRA as an exercise" of those military-supporting powers, the plaintiff's USERRA suit qualified for plan-of-the-Convention treatment, meaning that Texas lacked sovereign immunity. *Id.* at 587, 599.

Quite unlike the Supreme Court's abrogation precedents—which, as explained, have proceeded on a provision-by-provision basis—its holding in *Torres* was categorical. The Court there didn't focus on USERRA in particular; instead, it considered whether the states had waived wholesale their sovereign immunity with respect

to suits involving the federal government's national-defense pow-
ers—and concluded that they had.  *See id.* at 590–94, 599.  Hence
*Torres*'s robust major premise:  Eleventh Amendment immunity
does not bar suits against states authorized by Congress pursuant
to an exercise of its "power to build and maintain the Armed
Forces."  *Id.* at 590, 594.

So, when Congress validly legislates pursuant to its power
to raise and support a military, it may authorize suits against the
states—without regard to their sovereign immunity.  The question
here is thus whether Congress did so:  When it enacted the active-
duty and servicemember-leave provisions of the FMLA, *see* 29
U.S.C. § 2612(a)(1)(E), (a)(3), was Congress exercising its constitu-
tional authority to raise and support a military?  We conclude that
it was.

**2**

Perhaps surprisingly, there's no standard method for deter-
mining the constitutional provision on which Congress relied
when enacting a particular piece of legislation.  Sometimes a stat-
ute's text or legislative history makes it clear.  *See, e.g.*, *Hibbs*, 538
U.S. at 726–27 & n.1.  But oftentimes, that's not the case, and Su-
preme Court precedent makes clear that a lack of smoking-gun ev-
idence isn't dispositive.  *Torres* is illustrative.  There, in holding that
"Congress enacted USERRA as an exercise of its power '[t]o raise
and support Armies' and '[t]o provide and maintain a Navy,'" the
Court simply surveyed the statute's subject matter and historical
context.  *Torres*, 597 U.S. at 585, 587 (alteration in original) (quoting

U.S. Const. art. I, § 8, cls. 12–13). Those, the Court seemed to assume, left little doubt about which constitutional provisions underlay the law: USERRA concerns servicemembers' employment, and it is rooted in the military-focused Selective Training and Service Act of 1940, ch. 720, 54 Stat. 885. The Court thus seemed to take for granted that Congress had enacted the law pursuant to its military-supporting powers. *See Torres*, 597 U.S. at 585–86, 587.

Here too, the context indicates that Congress's military-supporting powers undergird the FMLA's provisions protecting active-duty and servicemember-family leave. In enacting the original FMLA provisions—including § 2612(a)(1)(C)'s protection of family-care leave—"Congress relied on . . . its Article I commerce power and its power under § 5 of the Fourteenth Amendment." *Hibbs*, 538 U.S. at 726. The 2008 FMLA amendments—which included § 2612(a)(1)(E) and § 2612(a)(3)—are different. Congress added active-duty and servicemember family leave partly in response to recommendations made by the President's Commission on Care for America's Returning Wounded Warriors. *See* H.R. Rep. No. 110-477, at 916–17 (2007) (Conf. Rep.). President George W. Bush had charged the Commission with, among other things, seeking to ensure that wounded servicemembers coming back "from deployment in support of the Global War on Terror" had a "successful return to productive military service or civilian society." Exec. Order No. 13426, 72 Fed. Reg. 10589, 10589 (Mar. 8, 2007). The Commission found not only that many injured servicemembers received care from family members, but also that some of those family members gave up jobs to provide that care. *See*

*Findings of the President's Commission on Care for America's Returning Wounded Warriors*, 110th Cong. 6, 35–36, 57 (2007).  To that end, it recommended that Congress "amend the Family Medical Leave Act to allow up to six months' leave for a family member of a service member who has a combat-related injury."  *Id.* at 58, 157.  Other legislative history further ties the amendments to Congress's efforts "to encourage service in the Armed Forces in a variety of ways."  *Torres*, 597 U.S. at 585.  One Congressman, for instance, described the FMLA amendments as "an extension of a direction that Congress began" when it passed the Selective Training and Service Act—the same law that the Supreme Court cited in *Torres* as USERRA's forebear.  *The Family and Medical Leave Act: Extending Coverage to Military Families Left at Home*, 110th Cong. 13 (2007) (statement of Rep. Darrell Issa).

Additional contextual evidence confirms what the legislative history indicates.  When Congress added the active-duty and servicemember-family leave provisions to the FMLA, it did so as part of the National Defense Authorization Act, under the following designations: "Division A—Department of Defense Authorizations," "Title V—Military Personnel Policy," and "Subtitle H—Military Families."  National Defense Authorization Act for Fiscal Year 2008, Pub. L. No. 110-181, § 585(a)(2), 122 Stat. 3, 8, 129 (2008).  Those headings, while not decisive, are telling.  *Cf. Dubin v. United States*, 599 U.S. 110, 120–21 (2023) ("[T]he title of a statute and the heading of a section are tools available for the resolution of a doubt . . . ." (citation and quotation marks omitted)).

That's more than enough.  As *Torres* makes clear, Congress had no obligation to incant the words of the Army and Navy Clauses.  Indeed, the Supreme Court long ago held that "[t]he question of the constitutionality of action taken by Congress does not depend on recitals of the power which it undertakes to exercise." *Woods v. Cloyd W. Miller Co.*, 333 U.S. 138, 144 (1948); *accord United States v. Moghadam*, 175 F.3d 1269, 1275 n.10 (11th Cir. 1999).  In so doing, the Court upheld legislation under the military-supporting powers because it was "plain from the legislative history that Congress was invoking its war power to cope with a current condition of which the war was a direct and immediate cause." *Woods*, 333 U.S. at 144 (footnote omitted).  And here, the legislative history and related context are unmistakable:  When it added the active-duty and servicemember-family leave provisions to the FMLA, Congress was exercising its constitutional powers to support members of the military and respond to the aftermath of "the Global War on Terror." Exec. Order. No. 13426, 72 Fed. Reg. 10589, 10589 (Mar. 8, 2007).  We thus have no trouble concluding that, just as in *Torres*, Congress enacted § 2612(a)(1)(E) and § 2612(a)(3) "as an exercise of its power '[t]o raise and support Armies' and '[t]o provide and maintain a Navy.'"  597 U.S. at 587 (alteration in original) (quoting U.S. Const. art. I, § 8, cls. 12–13).[6]

---

[6] The Board protests that "Williams has cited no *evidence* that Congress enacted the military caregiver provisions of the FMLA, or the Act as a whole, pursuant to [Congress's military-supporting powers]." Reply Br. at 10–11 (emphasis added).  True enough, but that's no reason to ignore Williams's (correct) *argument* that plan-of-the-Convention waiver applies here.  *See* Appellee

That resolves this case. *Torres* held that Eleventh Amendment immunity doesn't bar suits against states arising out of statutes enacted pursuant to Congress's "power to build and maintain the Armed Forces." *Id.* at 590, 594. And, we conclude, when Congress amended the FMLA to include the active-duty and service-member-family leave protections, it did so pursuant to its military-supporting authority. Accordingly, insofar as Williams's suit alleges an entitlement to either of those kinds of FMLA leave, the Board's invocation of sovereign immunity fails.[7]

**3**

The Board advances two arguments why plan-of-the-Convention waiver doesn't permit Williams's lawsuit. Neither persuades us.

First, the Board asserts that the 2008 FMLA amendments "do not meet the standard for waiver of immunity identified in *Torres*: 'whether the federal power at issue is complete in itself, and the States consented to the exercise of that power—in its entirety—

---

Br. at 25–26. *Cf. Moghadam*, 175 F.3d at 1275 n.10 ("[I]n exercising the power of judicial review, we look only at the *actual* powers of the national government." (citation and quotation marks omitted)).

[7] Neither *Katz*, *PennEast*, nor *Torres* assessed whether the particular statutes at issue in those cases were *valid* exercises of Congress's authority under its bankruptcy, eminent domain, or military-raising powers, respectively. *Cf. Katz*, 546 U.S. at 379; *PennEast*, 594 U.S. at 508; *Torres*, 597 U.S. at 599. And here, the Board doesn't contend that the 2008 FMLA amendments were an invalid exercise of Congress's military-raising powers. So, following the Supreme Court's lead, we pretermit that issue.

23-11286                Opinion of the Court                21

in the plan of the Convention.'"  Reply Br. at 11 (quotation marks omitted) (quoting *Torres*, 597 U.S. at 589).  But the Board misunderstands the nature of plan-of-the-Convention waiver.  The "complete in itself" test isn't applied statute-by-statute.  In fact, it isn't applied to statutes at all; rather, it serves to evaluate which *constitutional powers* qualify for plan-of-the-Convention treatment, as the recent trio of plan-of-the-Convention cases illustrates.  *Katz* wasn't just about whether some particular provision of the Bankruptcy Code qualified for plan-of-the-Convention treatment; it was about whether a waiver existed writ large "in the context of bankruptcy proceedings."  *PennEast*, 594 U.S. at 500 (citing *Katz*, 546 U.S. at 379).  *PennEast* wasn't just about whether a particular federal statute authorized eminent domain proceedings against states; it was about whether "the States consented at the founding to the exercise of the federal eminent domain power."  *Id*. at 509.  And *Torres* wasn't just about whether states could use sovereign immunity to block USERRA suits; it was about whether "the States, in coming together to form a Union, agreed to sacrifice their sovereign immunity for the good of the common defense."  594 U.S. at 599.  When a constitutional power triggers plan-of-the-Convention treatment, *all* suits filed under statutes that Congress enacted pursuant to that power escape state sovereign immunity.  So, it's a category error to say that the active-duty and servicemember-family leave provisions must themselves satisfy the "complete in itself" test.

Second, the Board seems to suggest that the 2008 FMLA amendments fail some kind of clear-statement rule.  In seeking to

distinguish *Torres*, the Board argues that whereas "USERRA specifically contemplates suits against state employers," the FMLA "contains no similar provision." Reply Br. at 12 (citing 38 U.S.C. § 4323). The Board is mistaken, for two reasons. As an initial matter, the clear-statement rule is a function of abrogation doctrine, not plan-of-the-Convention doctrine. *See, e.g.*, *Garrett*, 531 U.S. at 363. In the latter, Congress doesn't need to clearly express an intent to abrogate sovereign immunity because there isn't any immunity to abrogate—the states have waived it. *See Allen*, 589 U.S. at 258–59. So long as Congress's "determination that States should be amenable" to suit "is within the scope of its power" under a constitutional clause to which plan-of-the-Convention logic applies, then the states are subject to suit—the Eleventh Amendment notwithstanding. *Katz*, 546 U.S. at 379. Here, Congress enacted the 2008 FMLA amendments pursuant to its military-supporting powers. That, paired with *Torres*'s holding, is all we need to know.

Moreover, and in any event, the FMLA actually *does* clearly contemplate suits against state employers—it authorizes aggrieved employees to sue "any employer (*including a public agency*)." 29 U.S.C. § 2617(a)(2) (emphasis added). In *Hibbs*, the Court held that this language satisfied the clear-statement rule that applies in the abrogation context. *See* 538 U.S. at 726. Accordingly, the FMLA satisfies any clear-statement rule that might apply.

★ ★ ★

23-11286                Opinion of the Court                23

Putting the pieces together, we conclude that Williams's suit may proceed.[8] This is true regardless of whether she is alleging an entitlement to family-care, active-duty, or servicemember-family leave. If it's family-care leave under § 2612(a)(1)(C), *Hibbs* dictates that Congress has validly abrogated the Board's immunity. And if it's active-duty leave under § 2612(a)(1)(E) or servicemember-family leave under § 2612(a)(3), *Torres* shows that the Board doesn't have any immunity to assert—Alabama waived that immunity when it joined the Union and acceded to the federal government's lead role in providing for the national defense.

## IV

For the foregoing reasons, we **AFFIRM** the district court's denial of the Board's motion to dismiss and **REMAND** for further proceedings consistent with this opinion.

---

[8] This conclusion applies to both Williams's retaliation and her interference claims. We "must consider sovereign immunity and any exceptions to it on a claim-by-claim . . . basis." *Muscogee (Creek) Nation v. Rollin*, 119 F.4th 881, 887 (11th Cir. 2024). But the sovereign immunity argument for both claims is precisely the same—that, pursuant to the purported underlying FMLA leave entitlement, sovereign immunity is either abrogated or waived.